# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 14, 2010 Session

# IN RE MADISON K. P.

**Appeal from the Juvenile Court for Rutherford County**
**No. 36611J     Donna Scott Davenport, Judge**

**No. M2009-02331-COA-R3-JV - Filed November 23, 2010**

This is an action to change the designation of the primary residential parent from Mother to Father. The child was born in 1999 when her parents were only sixteen years old. When the first parenting plan was established in 2000, Mother was designated the primary residential parent but the court ordered that she share "joint custody and guardianship" with her father and stepmother, with whom she and the child resided. Prior to the filing of this petition in 2009, the child was residing in Georgia with the maternal grandparents, Mother was residing in New York City, and Father was residing in Murfreesboro, Tennessee. When Mother advised Father that she was moving with the child to New Jersey, Father filed this petition to be named the primary residential parent. Mother challenged the petition contending, *inter alia*, that the Tennessee courts no longer have subject matter jurisdiction, that Georgia is the appropriate forum, and that she should continue as the primary residential parent. The Rutherford County Juvenile Court held that it maintained exclusive, continuing jurisdiction. Following a trial, the court found that a material change of circumstances existed and that Father should be designated as the primary residential parent. Mother appealed claiming that the trial court erred in exercising jurisdiction over the action and in designating Father as the primary residential parent. We affirm the trial court's determination that it maintains exclusive, continuing jurisdiction, however, we reverse the trial court's determination that Father should be named the primary residential parent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Gregory D. Smith and Rebecca K. McKelvey, Nashville, Tennessee, for the appellant, Brix M. J.

William Kennerly Burger and Claire S. Burger, Murfreesboro, Tennessee, for the appellee, Jared M.P.

**OPINION**

Madison K. P., the only child of Brix M. J. (Mother) and Jared M. P. (Father), is the subject of this factually unique custody dispute. Madison was born on September 17, 1999, when Mother and Father were sixteen years old, attending high school in Rutherford County, Tennessee, and living in the home of their respective parents.

In April 2000, an Order of Parentage was entered in the Juvenile Court of Rutherford County establishing Father's paternity. The order designated Mother as the primary residential parent; however, apparently due to her age, the order also stated that Mother share "joint custody and guardianship" with her father and stepmother, with whom Mother and Madison resided. Father was ordered to pay $200 per month in child support and a visitation schedule was established for Father.[1]

Over the next several months the parties continued to reside in Rutherford County; Mother and Madison resided with her parents and Father resided with his parents. Not long after Madison's birth, Mother resumed her high school career, during which time Father cared for Madison during the school day while Mother was at school and Mother resumed care of Madison after school.[2]

Mother graduated from high school in May of 2000. Soon thereafter, Mother and Madison moved with Mother's parents to Rock Hill, South Carolina.[3] Father remained in Rutherford County, Tennessee and resumed his high school career.

Soon after moving to South Carolina, Mother enrolled at Winthrop University in Rock Hill and worked part-time. Initially, Mother continued to live with her father and stepmother. While Mother was in class or working her stepmother cared for Madison, when she was not in class or at work, Mother cared for Madison. In 2001, Mother and Madison moved into family housing at the university; nevertheless, Mother's stepmother continued to assist with

_____

[1]Father was given the following visitation: the Wednesday before Thanksgiving until the Sunday after Thanksgiving in odd years, December 26th until January 2nd each year, every spring break for one week, a period of two weeks during the summer and additional visitation "as agreed to by the parties."

[2]Father was able to care for Madison during the day because he was not attending high school at the time; Father subsequently returned to school and graduated in 2001.

[3]The move was due to Mother's father being transferred.

Madison's care while Mother was in school and at work. During this period, one of Mother's jobs was at a daycare and Mother would take Madison with her to work. Madison continued to live with Mother, and Mother's stepmother continued to assist with caring for Madison until 2003, when Madison was three and a half years old.

In the interim, Father graduated from high school in 2001 and attended Middle Tennessee State University while living at home with his parents in Murfreesboro. Father maintained visitation with Madison during this period which, according to the parenting plan, included the Wednesday before Thanksgiving until the Sunday after Thanksgiving in odd years, December 26th until January 2nd each year, every spring break for one week, a period of two weeks during the summer and additional visitation "as agreed to by the parties." During this period and thereafter, Father's mother paid his child support obligation each month.

In 2003, Mother's father was transferred to LaGrange, Georgia. Because Mother was still in college, the decision was made between Mother and the maternal grandparents that Madison would live with the grandparents in LaGrange, Georgia while Mother finished college. Father did not participate in this decision but when he was told of the decision he did not object to Madison living full time with her maternal grandparents.

After Madison moved to Georgia, Mother visited her every three to four weeks. Mother graduated from college with a finance degree in December 2004 and took a job in Charlotte, North Carolina with Vanguard. At first Mother continued to reside in Rock Hill because it was approximately twenty minutes from Charlotte, however, in October 2005, Mother moved to Charlotte, North Carolina. Madison continued to reside with the maternal grandparents in LaGrange, Georgia. Mother continued to visit Madison every three to four weeks, and Father generally exercised his visitation privileges.

In 2005, the maternal grandparents moved with Madison to Augusta, Georgia.[4] Because Augusta was closer to Mother's home in Charlotte, North Carolina, Mother's visits with Madison increased. Father also maintained visitation with Madison pursuant to the parenting plan during this period.

In 2006, Father graduated from Middle Tennessee State University with a degree in criminal justice and went to work for a law firm in Nashville, Tennessee. Father lived in a house purchased by his parents. Father's mother paid his child support obligation each month. Father continued to exercise his visitation with the child as set out in the April 2000 parenting schedule.

---

[4]Every time the maternal grandparents moved it was due to a job transfer.

In November 2006, Mother moved to New York City to work for AXA Equitable. Father did not object when he was advised of the move and that Madison was to remain with the maternal grandparents in Augusta, Georgia. As a consequence of this move, Mother's visits with Madison decreased to every four to six weeks, however, Mother spoke with Madison daily. Father continued to exercise his visitation with Madison as set out in the April 2000 order.

In 2008, Father's summer visitation was increased by agreement from two weeks to four weeks.[5] As a result, Father's visitation increased to fifty-six days per year in odd years and fifty days in even years. That same year, Father enrolled at the Nashville School of Law while continuing to work for a law firm in Nashville. Father continued to reside in the house purchased by his parents and his mother continued to pay his child support obligation each month.

In February 2009, Mother informed Father that she intended to bring Madison to live with her in New Jersey. Shortly thereafter, on February 20, 2009, Father filed a Petition to Modify Custody/Primary Residential Status in the Juvenile Court for Rutherford County, Tennessee. In the petition, Father asserted that a material change of circumstances existed and that it was in the child's best interests for Father to be named the primary residential parent.

On March 6, 2009, Mother filed a Complaint to Modify Custody, Visitation, and Child Support in the Superior Court of the County of Columbia, Georgia. On March 12, 2009, Mother filed a Motion to Dismiss for Inconvenient Forum in the Rutherford County court claiming that the juvenile court should not exercise jurisdiction over the matter. The Rutherford County Juvenile Court denied Mother's motion in an order entered on March 25, 2009. On May 29, 2009, Mother filed an Answer and Counter-Petition in the Tennessee court asserting that the court no longer had subject matter jurisdiction over the action because the child had not resided in Tennessee on a permanent basis since 2000, and that the child had resided exclusively in Georgia since 2003. Thereafter, Mother filed motions to continue and to reconsider subject matter jurisdiction. On July 1, 2009, the Rutherford County Juvenile Court denied Mother's motions, holding that it had original, continuing, and exclusive jurisdiction over the action.

A trial was held in the Rutherford County Juvenile Court on July 7, 2009 and July 22, 2009. Two months later, on September 11, 2009, the court issued a Memorandum Opinion granting immediate custody of the child to Father. On October 1, 2009, an order was entered

---

[5]The April 2000 parenting plan provided Father a period of two weeks during the summer and additional visitation "as agreed to by the parties."

designating Father as the primary residential parent and adopting a new parenting schedule. The new parenting schedule afforded Mother visitation on Mother's Day, Mother's birthday, July 4th on even years, Fall Break during odd years, December 26th until January 2nd every year, and one month during the summer. This appeal followed.

## ANALYSIS

Mother raises several issues for our consideration. She challenges the subject matter jurisdiction of the Tennessee courts.[6] She contends the trial court erred in finding that a substantial and material change of circumstances exists and in changing the designation of primary residential parent from Mother to Father. She also contends the parenting schedule adopted by the court was unnecessarily punitive. We shall first address the issue of subject matter jurisdiction.

### I.
### SUBJECT MATTER JURISDICTION

Subject matter jurisdiction is the basis for a court's authority to act. *Meighan v. U.S. Sprint Commc'ns. Co.*, 924 S.W.2d 632, 639 (Tenn. 1996). Whether a court has subject matter jurisdiction is a question of law for which this court conducts a de novo review. *Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000).

Under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), "a court of this state which has made a child-custody determination consistent with this part has *exclusive, continuing jurisdiction over the determination* until":

> (1) A court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

---

[6]Father argues that the issue of subject matter jurisdiction cannot be considered by this court because Mother did not provide a transcript of a motion hearing on the issue pursuant to Tenn. R. App. P. 24. In essence, Father contends that Mother "waived" the issue, however, subject matter jurisdiction cannot be waived. *Meighan v. U.S. Sprint Commc'ns. Co.*, 924 S.W.2d 632, 639 (Tenn. 1996). The cases cited by Father, one regarding a motion to suppress and one regarding a motion to compel discovery, have no relevance to the action at hand. We also note that the trial court reiterated its ruling regarding subject matter jurisdiction in the order from which Mother appealed.

(2) A court of this state or a court of another state determines
that the child, the child's parents, and any person acting as a
parent do not presently reside in this state.

Tenn. Code Ann. § 36-6-217(a)(1)-(2) (emphasis added). The parties agree that the applicable provision is § 36-6-217(a)(1) as Father still resides in Tennessee. Thus, we must determine whether the child has a significant connection with this state and whether there is substantial evidence within the state concerning "the child's care, protection, training, and personal relationships."

"[T]he UCCJEA gives the court that made the original custody decision the authority to determine when its exclusive, continuing authority over custody has ended," which has been characterized as "'a right of first refusal.'" *Conover v. Conover*, No. M2009-01856-COA-R3-CV, 2010 WL 3420548, at *5 (Tenn. Ct. App. Aug. 31, 2010) (quoting *Jones v. Taylor*, No. M2005-02772-COA-R10-CV, 2006 WL 2450273, at *7 (Tenn. Ct. App. Aug.21, 2006); *Cliburn v. Bergeron*, Nos. M2002-01386-COA-R3-CV, M2001-03157-COA-R3-CV, 2002 WL 31890868, at *8 (Tenn. Ct. App. Dec. 31, 2002)). In this action, the trial court held that it retained exclusive, continuing jurisdiction because the Mother had never resided with the child in Georgia and the child would not be returned to Georgia, because the child would either live with Mother in New Jersey or Father in Tennessee.

Mother cites to the case of *Graham v. Graham*, No. E2008-00180-COA-R3-CV, 2009 WL 167071 (Tenn. Ct. App. Jan. 26, 2009), in which this court found that Tennessee no longer retained subject matter jurisdiction where the mother and the children no longer resided in this state. We, however, find *Graham* distinguishable. In *Graham*, the custody decree was entered in Tennessee, Mother and the four children resided in Florida, and Father resided in Tennessee. Father had eight-five days of visitation per year. *Id*. Father filed a petition in Tennessee seeking to be named the primary residential parent; Mother responded contending that Tennessee no longer had subject matter jurisdiction as it was not the home state of the children. *Id*. at *4. The trial court issued a ruling on the underlying petition and designated Father as the primary residential parent. *Id*. On appeal, this court ruled that the trial court erred in failing to dismiss the action for lack of subject matter jurisdiction. *Id*. at *6. The court determined that the four children no longer had a "significant connection" with the state of Tennessee and that substantial evidence was unavailable in Tennessee regarding the children's "care, protection, training, and personal relationships." *Id*. More specifically, the court correctly found that "[a]ll of the evidence offered regarding the alleged 'material change in circumstances' and the 'best interests of the children' concerned events and relationships that took place in Florida" explaining:

In the instant case. . .the only connection the children have with Tennessee is that their father lives there and they visit with him during holidays and summers. Moreover, all the evidence regarding the father's allegation that the mother's problems with her husband, Jason Lewis, and their divorce proceeding created a material change in circumstances for the children and that a modification of custody would be in their best interest originated in Florida. The principal evidence given by the father as to the "chaotic, dysfunctional and argumentative" Florida home environment came from the mother's estranged husband, and all of the events relied upon took place in Florida. The videotape and testimony from a private investigator regarding an extramarital affair the father alleged the mother had engaged in was exclusively related to Florida. Additionally, the witnesses, such as teachers, coaches, ministers, doctors, neighbors and family members, best qualified to testify and present other evidence regarding the children's well-being, protection, training and personal relationships are all located in Florida. The evidence establishes that the courts of Tennessee no longer have continuing exclusive jurisdiction over custody issues regarding these children.

*Id.* at *9. This, we believe, is the critical distinction between *Graham* and this case. The material change of circumstances alleged by Father in the petition is the proposed relocation of Madison to New Jersey and the alleged distress at not residing with one of her parents. Neither party seeks to leave Madison in Georgia with the maternal grandparents and Mother does not assert that there is any material evidence in Georgia that would assist the court in determining whether Madison should live in New Jersey with Mother or Tennessee with Father. In *Graham,* the only remaining connection to Tennessee was that Father resided in Tennessee. What was more significant in *Graham* was that *Mother and the four children resided together in Florida*. That is not the case here. Neither parent resided with Madison in Georgia, therefore, there is no need to call as witnesses Madison's teachers or doctors in Georgia to determine whether Madison should live with Father in Tennessee or Mother in New Jersey.

We, therefore, find that the Rutherford County Juvenile Court has exclusive, continuing jurisdiction over this action.

## II.
### PETITION TO MODIFY CUSTODY/PRIMARY RESIDENTIAL STATUS

Mother contends the trial court erred in finding that a material change of circumstances existed and that it was in Madison's best interest for Father to be designated

the primary residential parent. Mother also asserts that the decision was based on erroneous factual findings that are not supported by the record. She also contends that the new parenting schedule adopted by the trial court was overly punitive towards Mother.

Trial courts have broad discretion in matters of child custody, visitation, and related issues. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). The trial court must base its decision, however, on the evidence presented to them and upon the proper application of the relevant principles of law. *Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004). "While we are reluctant to second-guess a trial court's decisions regarding a parenting plan, we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement." *Id*.

We review the trial court's findings of fact de novo with a presumption of correctness and honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008). When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)).

## A.
### MATERIAL CHANGE OF CIRCUMSTANCES

This action presents a very unique set of facts, which make it difficult to apply the standard legal principles. This is because the maternal grandparents have been the primary caregivers for most of Madison's life, both parents have exercised limited parenting time with Madison, and neither parent has lived in the same state as Madison in the past few years. What also makes the standard legal principles difficult to apply is the fact that both parents have praised the exemplary care provided by the maternal grandparents; nevertheless, leaving Madison in the care and custody of the maternal grandparents is not an option as Father wants Madison to live with him in Tennessee and Mother wants Madison to live with her in New Jersey.

The foregoing notwithstanding, the threshold issue in modification proceedings is whether a material change of circumstances affecting the child's best interest has occurred since the adoption of the existing parenting plan. Tenn. Code Ann. § 36-6-101(a)(2); *see Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). When a decree establishing a parenting plan has been entered and becomes final, the parenting plan is res judicata and is conclusive in a subsequent application for modification unless a new fact has occurred that has altered the circumstances in a material way so that the best interest of the child requires

a modification of the parenting plan. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999) (citing *Long v. Long*, 488 S.W.2d 729 (Tenn. Ct. App. 1972)). Accordingly, the trial court cannot modify a parenting plan absent proof of a material change in circumstances affecting the child's best interest and proof that a modification of the plan is in the child's best interests. *Id*. (citing *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)). A material change of circumstances must be demonstrated by a preponderance of the evidence by the petitioner. Tenn. Code Ann. § 36-6-101(a)(2). The following factors are considered an appropriate basis for holding that a material change of circumstances has occurred: (1) the change occurred "after the entry of the order sought to be modified," (2) the change was "not known or reasonably anticipated when the order was entered," and (3) the change "affects the child's well-being in a meaningful way." *Kendrick*, 80 S.W.3d at 570 (quoting *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)).

In his petition, Father asserts that a material change of circumstances exists because Mother was designated as the primary residential parent but she has not been acting as the primary residential parent for several years. Father also asserts that moving Madison to New Jersey would constitute a material change of circumstances. In her answer and counter-petition, Mother also asserts that a material change of circumstances exists and that she should be designated as the primary residential parent "in lieu of the maternal grandparents continuing to exercise joint custody and guardianship."

Both parents assert that a material change of circumstances exists, and the trial court found that various events that have occurred since the entry of the 2000 order constitute a material change of circumstances. Considering the unique facts of this case, we fully concur with and affirm the trial court's finding that a material change of circumstances exists.

B.
BEST INTERESTS OF THE CHILD

Once a court determines that a substantial and material change of circumstances has occurred, the next inquiry is whether modification of the parenting plan is in the child's best interest and, if so, to fashion a plan that is in the child's best interest. *Kendrick*, 90 S.W.3d at 570. Whether modification of an existing parenting plan is in the children's best interest should be determined based upon the factors set forth in Tennessee Code Annotated § 36-6-106(a):

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food,

-9-

clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;
. . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a)(1)-(5), (9)-(10).

The trial court found that it was in the best interest of the child for Father to be designated as the primary residential parent and for her to reside with him in Tennessee. Based upon our exhaustive review of the record, we have determined that the evidence preponderates against the trial court's ruling. To explain our reasoning, we will discuss the statutory factors and facts we find most relevant to this issue.

*Factor (1) – The love, affection and emotional ties existing between the parents and child. Tenn. Code Ann. § 36-6-106(a)(1).*

The trial court found this factor favored both parents equally. It is undisputed that both parents have a close and loving relationship with Madison; therefore, the evidence does not preponderate upon this finding.

*Factor (2) – The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver. Tenn. Code Ann. § 36-6-106(a)(2).*

The trial court found that this factor weighed in Father's favor. We have determined the evidence preponderates against this finding. The evidence does not support a finding that Father has been the primary caregiver. In making this finding the trial court focused on Father's compliance with the visitation schedule, found that Father took "more of an active role" in the child's life, and that Father provided "more frequent and consistent financial support for the child" while Mother was "complacent to allowing others to raise and financially support her child."

Father exercised approximately fifty to fifty-six days of visitation with the child per year. Because of this, it is easier to quantify the number of days Father visited with Madison; however, the record clearly reveals that Mother spent significantly more time with the child. The trial court also found that Father would often make additional visitation with the child, however, this finding is not supported by the record and Father did not seek to increase the summer visitation until 2008.

Father was required to pay $200 per month in child support and the record shows that this was timely paid, but it was always paid by Father's parents even though Father has worked full time since graduating from college in 2006. While this fact would be of no consequence generally, we find it significant in this case because the trial court criticized Mother for allowing her parents to support Madison while Father was doing the same thing.

The trial court also found that Mother "never" exercised custody pursuant to the 2000 order; however, the record shows that Mother was the primary caregiver immediately following the child's birth and she continued to be the primary caregiver until Madison was three and a half years old. It was in 2003, when the maternal grandparents moved to Georgia, that Mother entrusted the primary caregiving duties to her parents. Although Father fully consented to Madison living with the maternal grandparents, consent that continued from 2003 until 2009, Father now asserts that Mother's 2003 decision constituted an "abandonment" of the child. We note, however, Father never expressed dissatisfaction with this decision and that Father took no legal action for the next six years to become the primary caregiver, at least not until he filed this petition in 2009. Nevertheless, the trial court agreed with Father's characterization and found that Mother "abandoned" the child. We do not agree with the trial court's characterization of this decision, especially since Father agreed to the decision, Father took no action to assume the duties as the primary caregiver for the next six years, and, like Mother, Father benefitted from the fact he could finish his college education

-11-

without the burden of being the daily caregiver of a minor child. We also cannot conclude that Mother abandoned the child when Father did the same thing by never having nor seeking the responsibility to serve as the primary caregiver for Madison, at least not until 2009.

The trial court also found that Mother did not attempt to take physical custody of Madison until the filing of Father's petition in 2009, however, this finding is contradicted by the testimony of several witnesses, including Father himself. Father testified that the filing of the petition was precipitated by Mother's decision to take Madison to live with her in New Jersey. Further, Mother and the maternal grandparents all testified that several times during the child's life Mother had sought to keep Madison full time, however, the maternal grandparents either refused or strongly advised against it.

For the above reasons, we find that the evidence preponderates against the trial court's finding that this factor weighs in favor of Father and find, instead, that this factor weighs equally in favor of both parents.

> *Factors (3) & (4) – The importance of continuity in the child's life, the length of time the child has lived in a satisfactory environment, and the stability of the family unit of the parents. Tenn. Code Ann. § 36-6-106(a)(3)-(4).*

The trial court found that both of these factors weighed in favor of Father; we disagree.

Madison was nine years old when this case was tried. For the first three years of her life, from 1999 to 2003, Madison lived in a stable and loving environment with her Mother and the maternal grandparents at first and then with her Mother. In 2003, and for the next six years, Madison lived in a stable and loving environment with her maternal grandparents – an environment both parents have praised. However, the stable and loving environment that Madison was enjoying when this action commenced is no longer an option. This is because Mother desires for Madison to live with her in Summit, New Jersey and Father desires for Madison to live with him in Murfreesboro, Tennessee.

For her part, Mother testified at length to describe the town of Summit, New Jersey where she and Madison would live. She testified that she began meeting with a realtor in January 2009, that she was already approved for a mortgage, and that she had saved $11,000 for a down payment.[7] Mother presented pictures of the condominium that she hoped to purchase. Mother also testified that she has a stable job, paying $70,000, that she works from

---

[7]Mother stated she had not purchased a home because she was waiting on the court's ruling regarding custody of the child. She explained she would not buy this condominium unless Madison could live with her.

8:30 a.m. till 5 p.m., and that she has unlimited sick days for herself and family members in addition to twenty-four personal days per year and vacation for major holidays. Mother also explained that she had researched schools in Summit, New Jersey, which is within twenty-five minutes of her office in Jersey City. Mother testified that there was an elementary school in walking distance of the condo she hoped to purchase and that she had made a deposit to reserve a place for Madison in after-school care in Summit, New Jersey.[8] Mother also testified that she had several friends who lived in the area that could help her with the child should she become sick, including several childhood friends. Mother also testified that her current boyfriend, who Mother believed she would marry, and his family lived in New Jersey and would be able to help her with the child.

For his part, Father testified that at the time of trial he lived and worked in Nashville and attended evening law school classes in Nashville. He stated he planned to search for jobs in Murfreesboro and had signed a rental agreement for an apartment in Murfreesboro, and that until he found other employment he would commute to his job in Nashville and would commute to Nashville for his law school classes. Father also testified that his parents were available to provide whatever care Madison needed when he was unavailable.

It is upon the above factual background that the trial court made findings which we believe are contrary to the preponderance of the evidence. The trial court found that Father's current schedule would allow him to take the child to school and pick the child up from school on most days. In fact, Father testified that he currently worked 30 hours per week at a law firm in Nashville and then attended law school classes two nights a week from 6:30 p.m. till 10:30 p.m., and his class schedule would increase to three nights a week during the last two years of law school. Moreover, Father testified that his family would be responsible for the child's care during the afternoons, not Father, and Father even admitted his parents would provide the majority of care for the child.

The trial court was also troubled by the failure of Mother's boyfriend to testify at the trial regarding "his level of commitment to Mother" and "his willingness to assist Mother with caring for [the child]"; however, the trial court was not concerned that Father's girlfriend did not testify as to her level of commitment to care for Madison. We fail to see how the trial court can fault Mother for failing to call her boyfriend as a witness, but not Father, especially realizing that Mother's boyfriend was in New York at the time of trial while Father's girlfriend was in the courtroom.

---

[8]Mother testified that she did not have a vehicle due to her current residence in New York City, however, she would purchase a vehicle if the court approved the move.

The trial court also found that "Mother was satisfied being an absent parent and did not exhibit any desire to have the child with her on a daily basis, . . . until Father filed for a change of custody. . . . Then Mother decided that she would fight Father and move her child to the proposed possible home in New Jersey." The facts, however, preponderate against these findings. Most notably, Father acknowledged that his reason for filing the petition was Mother's desire to have Madison live with her in New Jersey. Father testified that the reason for filing of the petition was Mother's desire to have the child live with her, and not, as the trial court incorrectly stated, Mother deciding to "fight" Father. Moreover, Father testified that had Mother not expressed her desire to have Madison live with her in New Jersey he was willing for Madison to continue living in Georgia with the maternal grandparents. The trial court also found that Mother was "selfish" in choosing to pursue her career and not moving to Georgia, but the trial court made no such adverse finding concerning Father who was essentially doing the same things as Mother. Moreover, the maternal grandparents testified that they had "refused" previous efforts by Mother to take Madison until they believed she was established and ready to care for Madison on her own. Although the trial court only criticized Mother for leaving Madison in the sole care of the maternal grandparents, it is critical to note that *both* Mother and Father allowed Madison to remain in the sole care of the maternal grandparents for six years. Thus, the facts preponderate against the finding that Mother, but not Father, was "selfish" by leaving Madison in her parents' care.

For the above reasons, we find that the evidence preponderates against the trial court's finding that factors (3) and (4) favor Father; to the contrary, the factors favor Mother, although only slightly.

> *Factor (5) – The home, school and community record of the child. Tenn. Code*
> *Ann. § 36-6-106(a)(5).*

The evidence overwhelmingly established that Madison thrived under the care of the maternal grandparents in Georgia, where she has lived for the past several years. The evidence also reveals that Madison was very familiar with and loved Father's parents who live in Murfreesboro, Tennessee. The trial court found this factor weighed in favor of Father, however, we fail to see how this factor is relevant realizing the "home, school and community record of the child" is Augusta, Georgia, not Murfreesboro, Tennessee. Thus, we find the evidence preponderates against the trial court's finding on this ground.

> *Factor (7) – The reasonable preference of the child. Tenn. Code Ann. §*
> *36-6-106(a)(7).*

Although the parties stipulated that Madison desired to live with Mother, the trial court refused to consider Madison's preference due to what the court described as Mother's

"credibility" issues, that it would be detrimental emotionally for Madison to testify, and Madison's testimony would be "tainted" based upon discussions she had with Mother. We have concluded that the trial court erred by refusing to consider Madison's preference to live with Mother.

First, the trial court's finding that Madison's testimony would be tainted is not supported by the record. The only evidence in the record that pertains to this finding is that Madison sent Mother an email in which she asked the Mother if she had a good attorney; Mother replied "yes." There is no other evidence to suggest any communication between Mother and Madison regarding this action. Thus, there is no basis upon which to conclude that Madison' testimony would be tainted.

The trial court's refusal to consider Madison's desire to live with Mother was also based on the trial court's finding that Mother has "credibility" issues. We have concluded that the trial court's credibility finding is contrary to the preponderance of the evidence. The credibility determination was based on several findings. While we will not address all findings the trial court relied on to question Mother's integrity, we will address the more significant findings that pertain to its credibility determination.

One of the adverse findings the trial court made pertained to the fact that Mother did not terminate the joint custody and guardianship with the maternal grandparents when Mother reached the age of majority. The trial court held that the joint custody and guardianship provision stated in the 2000 order was solely for insurance purposes for Madison's benefit and that it was to have terminated when Mother turned eighteen. We believe this is an erroneous legal conclusion. The 2000 order does not expressly or implicitly state that the joint custody and guardianship was to expire when Mother reached the age of majority. Moreover, we find no legal or factual basis upon which to use this finding to conclude that Mother's testimony lacks credibility, especially since Father and the maternal grandparents all construed the order in the same fashion and functioned pursuant to their mutual understanding for years, all to the benefit of Madison. Further, Father not only acquiesced in the continuation of the joint custody and guardianship arrangement, Father was pleased that Madison remained in the physical custody and guardianship of the maternal grandparents. In fact, Father testified at trial that had Mother not attempted to relocate Madison to New Jersey, he would have been willing for Madison to remain indefinitely with the maternal grandparents and for that to continue the joint custody and guardianship order would have to be in effect. Accordingly, we construe the 2000 order differently than the trial court.

We also find it relevant that the parties, including Father and the grandparents, construed the 2000 order in the same way as Mother. Therefore, if the parties construed the

2000 order the same way and conducted their affairs pursuant to their mutual understanding of the order, even if they are all wrong, this fact does not justify an adverse credibility finding against Mother but not Father.

Another reason for the trial court's adverse credibility finding against Mother pertained to what the trial court found to be material differences in her testimony at trial and her deposition regarding Father's marijuana use during high school. We find the references to Father's alleged use of marijuana in high school remote in time and, thus, of little significance to the matters at issue in the petition. Further, we do not find any material differences in her testimony upon which to make a credibility finding. Thus, this finding does not provide a factual basis upon which to make an adverse credibility finding.

The trial court also found it significant that Mother renewed her South Carolina driver's license when she moved to New York City instead of obtaining a New York driver's license. Even though Mother did not have a car in New York, she should have obtained a New York license – assuming she intended for that state to be her residence; nevertheless, we fail to see how this is relevant to Mother's credibility or how this circumstance indicates that Mother's testimony lacks credibility.

The trial court relied upon the above findings of fact to make its adverse credibility finding concerning Mother, however, we have concluded that the evidence preponderates against these findings. We acknowledge that the trial court is in a better position than this Court to observe the demeanor of the witnesses and where issues of credibility and weight of testimony are involved this Court will accord considerable deference to the trial court's findings, *Larsen-Ball*, 301 S.W.3d at 235; nevertheless, we have concluded the evidence preponderates against the trial court's credibility finding. *See Gillock v. Bd. of Prof'l Responsibility of Supreme Court of Tenn.*, 656 S.W.2d 365, 367 (Tenn. 1983) (affirming the trial court's credibility finding stating that "We cannot say from our review of the record that the evidence preponderates against the trial judge's finding on the issue of credibility."). Accordingly, we respectfully disagree with the trial court's finding that Mother is not credible.

We also note that the trial court made a finding that the maternal grandparents were unable to follow court orders. We are unable to reach the same conclusion as the trial court because no one criticized the actions or conduct of the maternal grandparents and Father repeatedly praised the conduct of the maternal grandparents. We acknowledge, as the trial court correctly found, that the maternal grandparents used their surname as Madison's last name for school purposes, which was contrary to the 2000 Order of Parentage, which stated that Madison would have Father's surname. The maternal grandparents admitted they had done this but, as they testified, they only used their surname for school purposes. Moreover,

it was undisputed that they used Father's surname to identify Madison away from school. Although the maternal grandparents should have fully complied with the 2000 order, we find it significant that Father was fully aware the maternal grandparents used their surname for Madison as it pertained to school activities for at least three years with no objection and Father would not have filed this petition if Madison were to stay with the maternal grandparents in Georgia. We, therefore, find the evidence preponderates against the adverse finding concerning the maternal grandparents.

For the foregoing reasons, we find the trial court erred in refusing to consider Madison's preference. As the parties stipulated that it was her preference to live with Mother, this factor weighs heavily in favor of Mother.

> *Factor (9) – The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child. Tenn. Code Ann. § 36-6-106(a)(9).*

The trial court found this factor weighed in favor of Father based upon Mother's credibility and character, i.e. "selfishness", and Father's consistent and credible testimony. We disagree for several reasons. First, this factor pertains to the character and behavior of other persons who reside or frequent the home of a parent, it does not pertain directly to the credibility or character of Mother or Father. Thus, the reasons given by the court, if supported by the preponderance of the evidence, and they are not, are not relevant to this statutory factor. Moreover, we have already explained that the evidence preponderates against the trial court's findings as to credibility and character.

As for the character and behavior of a person who resides in or frequents the home of a parent and that person's interactions with the child, the trial court noted that it was troubled due to its lack of knowledge concerning Mother's boyfriend, and we find there is no evidence upon which to base a finding that he is not a person of good character or that he engages in bad behavior. We, therefore, find this factor does not weigh in favor of Father.

> *Factor (10) – Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each parent to facilitate and encourage a close and continuing parent-child relationship between the child and other parent, consistent with the best interest of the child. Tenn. Code Ann. § 36-6-106(a)(10).*

The trial court found this factor weighed in favor of Father; yet, again, we find the trial court's reasoning is based on findings of fact that are contrary to the preponderance of

the evidence and, in particular, that it is particularly influenced by the court's unsupported finding that Mother's behavior was "selfish" but Father's similar behavior was not.

The trial court appears to have disregarded the testimony of the maternal grandparents, who were the primary caregivers of Madison, both of whom testified that Mother was an excellent parent and that Mother continued to be an active, interested participant in the child's life despite the distance. The maternal grandmother testified that during Mother's visits, Mother completely took over the care of the child and that often the maternal grandparents would take a weekend trip during the visits leaving Mother alone with the child. Mother spoke with the child daily either by phone or by email. Mother attended the child's soccer games on her visits and assisted with her schoolwork.[9]

In contrast, the trial court highlights Father's actions of going "above and beyond" his requirements under the 2000 order. We acknowledge that Father has been a good, albeit distant parent, in a fashion similar to Mother; however, we find no facts upon which to conclude that Father went "above and beyond" his duties as a distant parent. Father acknowledged that in the early years of Madison's life he did not exercise his full visitation and he acknowledged that his parents paid the child support he was obligated to pay. The court found that Father provided additional support beyond his child support obligation, however, the only evidence in the record of this was a one time payment of a summer camp fee of $260 made during the pendency of the litigation. We do not intend to minimize Father's good actions, but make these observations in order to establish that the facts in the record do not support the trial court's finding.

For the above reasons, we have determined that this factor, factor (10), weighs in favor of both parties equally.

C.

PRIMARY RESIDENTIAL PARENT

The trial court found that it was in Madison's best interest to name Father as the primary residential parent. This decision was based on the trial court's findings that six factors favored Father, that no factors favored Mother, and that one factor favored both parents equally. Based upon our extensive review of the record, we have determined that no

---

[9]The trial court makes no mention of such testimony, instead focusing on Mother missing one Mother's Day visitation in 2009 because she was in Spain on vacation. Notably, Father testified that he only spent four Father's Days with the child in the past nine years with the reason as its proximity to the Fourth of July.

factors favor Father, while three factors favored Mother, and three factors favored both parents equally.[10]

The testimony at trial demonstrated that both parents, despite not being the primary caregivers of Madison, have close, loving relationships with Madison, both parents are of good character and integrity, and both parents are capable of being the caregiver for Madison. The evidence also demonstrated that Madison is extremely fortunate to have wonderful grandparents, paternal and maternal, who love her and who are willing to provide for Madison in every way. Of course, as the competing petitions and the evidence reveal, the only choice for the court is to name either Father or Mother as the primary residential parent and for Madison to reside where that parent resides. Having considered all the extensive record and having applied the requisite legal principles and statutory factors to ascertain the best interest of Madison, we reverse the decision of the trial court and find it is in Madison's best interest that Mother be named the primary residential parent and that Madison reside with Mother.

D.
PARENTING PLAN

Because we have named Mother instead of Father as the primary residential parent, we vacate the parenting plan adopted by the trial court and remand for the trial court to adopt a parenting plan that is based on the fact that Mother is the primary residential parent and that Madison will reside with Mother.

IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. We affirm the trial court's determination that it maintains exclusive, continuing jurisdiction over this matter. We reverse the trial court's determination that Father shall be named the primary residential parent and we vacate the parenting plan that was adopted. This matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the Appellee, Jared M.P.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[10]We also found that the trial court credited Father with two factors, which were not relevant to this action.